IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CULLAN AND CULLAN LLC,<br>On Behalf of Itself and<br>All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>M-QUBE, INC., *et al.*,<br><br>Defendants. | Case No. 8:13-cv-00172<br><br>The Honorable Joseph F. Bataillon |

### MOBILE MESSENGER'S AND M-QUBE'S
### OPPOSITION TO MOTIONS TO INTERVENE

**I.    INTRODUCTION**

The present lawsuit against Mobile Messenger and m-Qube, and the other two pending class action lawsuits whose plaintiff attorneys seek to block settlement here, seek to exact damages from Mobile Messenger and m-Qube for the alleged wrongful acts by companies using the m-Qube platform. The allegations that m-Qube – essentially a mass high-speed conduit for communications between companies and consumers – bears responsibility for the use of its platform are meritless. Mobile Messenger and m-Qube (affiliated companies under common ownership and control, hereinafter referred to as "m-Qube") are confident that they will prevail in this litigation and the other related cases.

But m-Qube seeks to settle this case because it benefits consumers. And m-Qube wishes, through this proposed settlement, to introduce further safeguards for consumers in the field of premium SMS, and to demonstrate its ongoing commitment to consumer protection by offering broad injunctive relief to the public, and monetary relief to consumers who may have been wronged in any way even though m-Qube is not liable in any way.

Of the three lawsuits against m-Qube, only this one warrants a class wide settlement because it provides far broader relief to a greater number of consumers when compared to the objectives that the plaintiffs in *Fields*[1] and *Geier*[2] seek to accomplish. The settlement also will allow m-Qube to conserve judicial resources, and resources of their own, by ending time consuming and expensive litigation on which they believe they will prevail. Besides, of the three lawsuits, this is the only one that m-Qube is ever prepared to settle.

By contrast, nobody will benefit without the settlement. Fields seeks $780,000,000, and Geier seeks $225,000,000 – amounts that far exceed m-Qube's wherewithal. (Ex. 1, Ex. L, 10/29/13 Hrg. Trans at 24:22-25:5; ECF No. 39 at 5; ECF No. 42 at 4, 9). Cullan has not identified how much it seeks for its classes, but counsel represented that the amount will be substantially more. m-Qube cannot withstand a judgment approaching anything close to what proposed intervenors seek – 1 billion dollars – and would be forced into bankruptcy if any one of these cases results in a judgment. And, given these damage estimates, intervenors' complaints about the settlement fund size and other things, and how intervenors are conducting their respective cases, m-Qube cannot and will not settle the *Fields* or *Geier* actions.

Without the settlement proposed in this case, the classes in the three cases will get nothing. Either m-Qube will prevail on the merits in which case the classes get nothing, or the plaintiffs will obtain judgments and force m-Qube into bankruptcy, in which event they would stand in back of the bankruptcy stack and would be the last to be paid after secured debt, employee debt, and contract debt.

In *Geier*, plaintiff's counsel sued m-Qube only, and not the merchant actually accused of deceptively marketing to Geier. m-Qube is planning an appeal of a recent finding by the court

---

[1] *Fields, et al. v Wise Media, LLC, et al.*, No. 12-CV-05160-WHA (N.D. Cal) ("*Fields*").
[2] *Geier v M-Qube Inc., et al*, No. C13-354 TSZ (W.D. Wash) ("*Geier*").

that although "m-Qube's records seem to suggest very strongly that there was an agreement" and "I do believe that the defendants have strongly presented evidence suggesting that the way -- the evidence points very strongly in favor of there being a contract between the parties" to waive claims against m-Qube and submit any dispute to arbitration, m-Qube may not have been qualified as a third party beneficiary. (Ex. 1, Ex. M, 10/17/13 Hrg. Trans. at 7:22-23; 53:7-10). Should m-Qube not prevail in the appeal, it would proceed to litigate the *Geier* case and prevail based on the fact that m-Qube functions as a mere conduit without the type of knowledge or control that could make it liable for any alleged wrongful acts of one of its merchant customers.

The pretrial conference in *Geier* is not scheduled until March 27, 2015, and that date likely will be delayed because of m-Qube's upcoming appeal to the Ninth Circuit (m-Qube has an automatic right of appeal under the Federal Arbitration Act). (Ex. 5, *Geier* scheduling order).

In *Fields,* absent a settlement here, m-Qube is left with no choice but to litigate the case to completion, since plaintiff's counsel has repeatedly engaged in tactics that make m-Qube unable ever to fashion a settlement with or through them. And besides, the case relates only to a minority of the class to whom m-Qube offers settlement in this case. And, although trial is scheduled in *Fields* for next year, the Court stayed the action as to lead defendant Wise Media. (Ex. 3, *Fields* stay order). Thus, it is unclear when a trial will occur in *Fields* although the stay extended only to Wise Media. Regardless, even assuming the classes were to obtain some relief through a judgment – in *Fields* other defendants besides m-Qube could actually be liable – neither of those cases will yield any benefit to the class for years.

The settlement is in the best interests of all parties. It is fair, adequate and reasonable. Its injunctive relief provisions provide new and meaningful safeguards to consumers – with m-Qube itself assuming legal responsibility to control and record consumer transaction authentication.

3

And, it includes monetary payments to those who believe they have suffered any injury – regardless of the fact that m-Qube was not responsible for any such injury. In all events, non-parties cannot intervene to seek dismissal under the "first to file rule" because intervention for that purpose is late and that motion will fail on the merits. Further, putative intervenors lack standing to object to the settlement now, and each of their objections is easily resolved or does not justify delaying preliminary approval.

## II. THE COURT SHOULD DENY THE MOTIONS TO INTERVENE

### A. Proposed Intervenors Cannot Seek Dismissal

Proposed intervenors from the *Fields* action cannot seek dismissal on the ground of the "first to file rule" because the argument is late and will fail on the merits. "To determine whether a motion to intervene is timely, we have instructed district courts to consider '(1) the extent the litigation has progressed at the time of the motion to intervene; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties.'" *Ortega v. Uponor, Inc.*, 716 F.3d 1057, 1065 (8th Cir. 2013).

Intervenors' attempt to seek dismissal is late. Plaintiff filed the complaint on June 6, 2013, and the complaint simultaneously became publically available through PACER. Only now, almost five months after the complaint was filed, do intervenors seek to dismiss the complaint. Allowing intervenors to seek dismissal now will prejudice m-Qube – indeed it will prejudice the class – by delaying the monetary benefits and injunctive relief that the settlement provides while the parties brief and the Court considers intervenors' motion. Nothing stopped intervenors from seeking dismissal long ago, and they provide no excuse for their delay.

4

Any motion to dismiss under the "first to file rule" will fail in all events. "The first-filed rule is one 'that typically determines, in the absence of compelling circumstances, which of two concurrent federal court actions should proceed to judgment.'" *AG Leader Tech, Inc. v. NTech Indus., Inc.*, 574 F. Supp. 2d 1011, 1015 (S.D. Iowa 2008) (quoting *Smart v. Sunshine Potato Flakes, L.L.C.*, 307 F.3d 684, 687 (8th Cir. 2002). To dismiss or transfer a case under the first-filed rule, the two litigations must be "parallel." *Id.* (internal citation omitted). Although the Eighth Circuit has not defined "parallel" in this context, other circuits hold that "two actions are parallel only where the parties and issues are identical," and "even where the two claims arise out of the same set of facts, the proceedings may not be parallel if they contest different aspects of the same issue, seek different relief, or do not include all of the same parties." *Id.* (citing *CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc.*, No. C 04-79 LRR, 2005 WL 741911 (N.D. Iowa Mar. 31, 2005).

The *Fields* and *Cullan* cases are not "parallel." Cullan and CF Enterprises are not parties in *Fields*; none of the plaintiffs in *Fields* are parties in this case; and *Fields* contains nine parties that are not parties in this case. Further, intervenors themselves assert that the "the *Fields* action and the claims of the *Cullan* class are starkly different . . . [and] the short codes that were used to text the *Fields* class members [are] short codes that have nothing to do with the *Cullan* action. (ECF No. 42 at 12.) By intervenors' own words, the parties and issues in the *Fields* and *Cullan* actions are not parallel, and any motion to dismiss under the "first to file" rule will fail.

### B.     Proposed Intervenors Cannot Object to the Settlement Now

"In our circuit, a party seeking to intervene must establish Article III standing in addition to the requirements of Rule 24." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009) (citations omitted). Thus, to demonstrate standing, a plaintiff must clearly

5

allege facts showing an injury in fact, which is an injury to a legally protected interest that is concrete, particularized, and either actual or imminent." *Id.* at 833-834 (internal quotations and citations omitted); *Curry v. Regents of the Univ. of Minn.*, 167 F.3d 420, 422 (8th Cir. 1999). "The plaintiff must also show that the alleged injury is fairly traceable to the defendant's conduct and that a favorable decision will likely redress the injury." *Id.* at 834 (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

At the preliminary approval stage, there is no legally protected interest that is concrete, particularized, or either actual or imminent because Section 9 of the agreement allows proposed intervenors to voice all of their objections – in full – after preliminary approval. Thus, courts hold that objectors may not object to settlements during preliminary approval. *Davis v. J.P. Morgan Chase & Co.,* 775 F.Supp.2d 601, 608 (W.D.N.Y.2011) (denying intervention and holding "to the extent that the proposed interveners have particular objections to the terms of the proposed settlement, there is no reason why those concerns cannot be fully and adequately aired at the fairness hearing and in the context of the Court's decision whether to finally approve the settlement"); *In re Penthouse Executive Club Comp. Litig.*, No. 10-CV-1145(KMW), 2013 WL 1828598, at *2 (S.D.N.Y. Apr. 30, 2013) (holding that "a plaintiffs' dissatisfaction with certain settlement terms is not a bar to preliminary approval" and "[t]he proper time for the Court to consider objections to a settlement is at the final approval hearing"); *Lane v. Facebook, Inc.*, No. 08-CV-3845(RS), 2009 WL 3458198, at *5 (N.D. Cal. Oct. 23, 2009) (denying motion to intervene and holding that intervenors "failed to establish any significantly protectable interest incumbent in an opportunity to object to preliminary approval as opposed to the right to object to final approval"); *In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liability Litig.*, 2011 U.S. Dist. LEXIS 2416, at *33-34 (W.D. Mo. Jan. 7, 2011) (granting preliminary approval and

6

ordering that "any objections that were directed to the motion for preliminary approval will be considered when the Court considers whether to grant final approval"). Likewise, none of the cases cited by proposed intervenors decided intervention before preliminary approval, many of them were not even class actions, and one of them denied intervention. *Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972) (not a class action); *Burkhalter v. Montgomery Ward & Co.*, 676 F.2d 291 (8th Cir. 1982) (not a class action); *Western Agricultural Ins. Co. v. Wilson Excavating, Inc.*, No. 10-CV-3151, 2011 WL 666246 (D. Neb. Feb. 12, 2011) (not a class action); *United States v. Union Elec. Co.*, 64 F.3d 1152 (8th Cir. 1995) (not a class action); *Standin v. Union Elec. Co.*, 309 F.2d 912, 917 (8th Cir. 1962) (not a class action); *Tweedle v. State Farm Fire & Cas. Co.*, 527 F.3d 664, 671 (8th Cir. 2008) (not a class action); *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1060 (8th Cir. 2013) (denying intervention); *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 686 *amended,* 858 F. Supp. 944 (D. Minn. 1994) (intervention after preliminary approval). The Court should follow the uniform line of authorities that consider objections only after preliminary approval.

### III. THE SETTLEMENT OBJECTIONS DO NOT BAR PRELIMINARY APPROVAL

Each of the objections lodged by proposed intervenors is easily resolved or does not bar preliminary approval.

#### A. Settlement Fund Amount

The settlement fund amount is sufficient in that it provides full refunds to anyone who requests a subscription charge refund, and a cash payment of $100 per qualified text message for TCPA damages – an amount that exceeds the $20 to $40 range negotiated by Geier's counsel in

7

another case. (Ex. 4, Bank of America Settlement). Further, m-Qube expects the number of claimants will be very small because no class member suffered harm by reason of any conduct even alleged against m-Qube. This is because of the many strong procedures and requirements that m-Qube and the carriers already have enforced, throughout the settled period, to ensure that consumers receive full disclosure and are only charged or receive messages from premium short codes following their express written consent, manifest by two-factor authentication. As m-Qube's chief executive officer explains in his declaration, for a consumer to make a charge to their mobile carrier bill using premium SMS, they must go through a two-factor authentication to order and confirm their charge. (Ex. 6, D. Wedd Dec. ¶ 6). In security parlance, "two-factor" means the transaction is authenticated by 1) something the user knows – he enters his phone number on a website, or texts a designated keyword to the short code; and 2) something the user has – the user confirms that the mobile handset is in his possession either by entering a unique one time PIN that is texted to his handset, or by confirming the transaction by replying to a disclosure message with a designated confirmation word, like "YES." *Id*. So, to opt-in to a premium SMS charge, a user must either (i) text in a keyword (like "GIVE") to a short code (like the Red Cross's short code 90999), receive a texted disclosure including conspicuous advice of charge, and confirm by texting "YES," or (ii) enter his phone number on a website with conspicuous advice of charge, followed by receiving a unique one-time PIN number via a text message sent to his phone, followed by transcribing that self-same PIN number back to the website, followed by a billed advice-of-charge message. (*Id*., ¶ 7). This is a transparent, well-known and strong way for a user to authenticate a charge. *Id*.

      m-Qube contracts with the wireless carriers, to operate this common gateway for approved Content Providers in a manner that protects consumers' privacy and protects them

8

against unauthorized charges or unsolicited texts in other ways. (*Id*., ¶ 10). In order to continue in business and generate revenue and profit, m-Qube must carry out this duty in a manner that satisfies the Wireless Carriers and their subscribers. *Id*. Many of the guidelines and processes that m-Qube follows, and enforces upon the Content Providers using its gateway are well-known. (*Id*., ¶ 12). And, a number of the consumer protection processes are maintained in confidence to help ensure security. *Id*. In addition to the guidelines and processes of the Wireless Carriers, m-Qube and scores of professionals engaged through m-Qube operate their own protocols to ensure that the programs that Content Providers operate in the m-Qube gateway are protective of consumers. *Id*. Some of the other protocols that m-Qube follows are set forth in Darcy Wedd's declaration filed simultaneously herewith. (*Id*., ¶¶ 13-18).

Independent third party Ryan McDonnell of Binary Factory, who operated the platform used by Wise Media in the *Fields* litigation, independently validated m-Qube's protocols to ensure consumer consent. He testified that the platform used by Wise Media "confirmed the validity of consumer subscription requests with secure PIN numbers," thereby disposing of any speculation that nobody consented to transactions involving Mobile Messenger and m-Qube. (Ex. 2, *Fields* ECF No. 179 at ¶¶1-6). Binary Factory's computer platform generated and maintained records reflecting consumer enrollments into Wise Media subscription plans as the enrollments occurred. (Ex. 1, Ex. H, McDonnell Dep. 82:4-83:3). McDonnell has no reason to believe that the enrollment confirmations are inaccurate, that anyone attempted to produce false opt-in information, or that Wise Media acted unlawfully in any way. (*Id.* 43:6-14; 82:7-13; 89:20-24; 105:3-106:1; 118:22-119:16). Thus, message logs maintained by Binary Factory and

9

produced by aggregators reflect voluntary consumer enrollments into Wise Media subscription plans. (*Id.* 117:18-118:2).

At bottom, m-Qube disputes that any consumer received any text message or incurred any subscription charge without their consent. In the unlikely event that they did, it was for no lack of trying by m-Qube from preventing it through its comprehensive and hands-on approach to consumer protection. Accordingly, m-Qube does not expect that claims will reach anything close to $6,500,000, or even $1,950,000. For this reason, and because m-Qube loses money each time a consumer receives a carrier refund, m-Qube negotiated a reversion and credit, and believes that the settlement fund will sufficiently cover all claims.

### B. Related Actions

The settlement does not extinguish all of the class claims in *Fields* or *Geier*. Section 2.36 expressly excludes Wise Media and The Winley Group as released parties (the lead defendants/content providers in *Fields*), and the *Fields* plaintiffs may seek any and all remedies – indeed double recovery – from these entities. Section 2.36 also excludes the content provider in *Geier* and other parties, and the class there can seek full redress from these parties. Although the settlement release would extinguish many class claims in *Geier* and *Fields* against Mobile Messenger and m-Qube, the settlement provides the proposed *Geier* and *Fields* classes full refunds for subscription charges, and the full benefit of the service improvements that m-Qube is offering by taking control over the transaction opt-in process.

Nothing in the *Fields* action precludes undersigned counsel from discussing or completing the settlement. Judge Alsup's order regarding class action settlements, filed in this action at ECF No. 43-6, lists factors that Judge Alsup considers, and it does not prohibit undersigned defense counsel from settling a case pending in a different jurisdiction (defense

10

counsel cannot file "a motion for appointment of interim class counsel"). Further, the *Fields* counsel incorrectly represented at the October 29 hearing that Judge Alsup "verbally at a hearing, including Mr. Rothman and Mr. Sege, that we are not to be engaging in settlement discussions prior to certification. And, again, these are the same attorneys. Mr. Rothman and Mr. Sege were right there in front of Judge Alsup with me and those are the instructions and there's a detailed order that says that this should not happen." (Ex. 1, Ex L, 10/29/13 Hrg. Trans. at 26:10-22).

First, nobody at Venable appeared at the hearing because Mobile Messenger had not engaged Venable to handle the litigation at that time. (Ex. 1, Ex. K, 3/21/13 Hrg. Trans. at 1). Second, Judge Alsup prohibited plaintiffs' counsel from engaging in settlement discussions on behalf of a class, and did not prohibit anyone – especially defendants – from discussing settlement in other litigation. (*Id.* at 4:13-15).

### C. Public Disclosure of Released Parties

Plaintiff and defendants have agreed to revise the settlement to remove the list of John Doe released parties. And, as clarified in the hearing and in the draft settlement papers, the class notice will still identify every single Third Party Content Provider in the manner known to class members – from their messages and phone bills, including, for every Third Party Content Provider included in the release one or more of the company's name, the short code, or the program name that would have appeared on the consumer's phone bill. Doing so will enable the Court and class members to identify what is being released, as short codes and program names appear on cell phone bills while party names may not. (*See* Ex. 1, Ex. B, Kevin Brewster Dep. at 36:25-37:25 & Ex. 37 at BREW000210; Ex. 1, Ex. D, Fields Dep. at 64:6-65:1 & Ex. 5 at FIELDS000023; Ex. 1, Ex. F, Kristianson Dep. at 12:13-17:22, 25:16-26:20, & Ex. 13; Ex. 1,

Ex. G, Kunder Dep. at 17:16-22:8, 90:14-18, & Exs. 23-26; Ex. 1, Ex. I, O'Hanks Dep. at 8:23-25; Ex. 1, Ex. J, Parmentier Dep. at 24:23-25:5; Ex. 1, Ex. A, Anderson Dep. at 30:20-24; Ex. 1, Ex. E, Hanson Dep. at 30:16-18).

### D. Notice

The proposed notice plan, devised by a qualified notice administrator, comports with due process. First, contrary to representations by intervenors, the notice plan includes direct notice via email where email addresses are available, and postcard notice for emails that bounceback. (ECF No. 30-1 at § 8.2.1). Consumers who called m-Qube or an m-Qube group company to inquire about their subscriptions and who provided email addresses will receive direct notice. (ECF No. 30-1 at § 8.2.1). Thus, the notice plan particularly targets class members, since it would include anyone who called an m-Qube call center to complain. Further, and contrary to the representation made at the October 29, 2013 hearing by *Fields* counsel that m-Qube do not have any email addresses for the *Fields* classes ("they say that they have some e-mail addresses but we know they're none of our class"), Mobile Messenger and m-Qube do have email addresses for some class members in *Fields* that transacted with Winley Marketing, a company at issue in some of the shortcodes listed in Exhibit A to the current *Fields* complaint. (Ex. 1, Ex. L, 10/29/13 Hrg. Trans. at 30:2-3; Ex. 6, D. Wedd Dec. at ¶ 20). The settlement also requires all released parties to obtain as many email addresses as possible for direct notice. (ECF No. 30-1 at § 8.2.1). m-Qube expects that a number of the released Third Party Content Providers do maintain their own call centers and may very well also possess email addresses of consumers who have complained, and a number of those Third Party Content Providers have already indicated to m-Qube that they will be forthcoming with lists of e-mail addresses. (Ex. 6, D. Wedd Dec. at ¶ 20).

12

Second, the notice plan includes Internet publication notice, ensures visibility via keyword searches, social media and other methods, and takes into account "powerful data showing that individuals now spend far more time seeking and consuming information on the Internet than from print sources." (ECF No. 30-1 at 8.2; ECF No. 30-3 at ¶¶ 6, 21-23). Publication notice is sufficient because searching the Internet is exactly how the *Fields* plaintiffs easily researched their claims, found counsel, and started their lawsuit. In fact, eight of the nine[3] *Fields* plaintiffs testified that they saw Wise Media on their cell phone bill, searched for Wise Media on the Internet, saw webpages stating that their current class counsel had previously filed a similar class action over Wise Media charges, and contacted their counsel. (Ex. 1, Ex. B, Kevin Brewster Dep. at 36:25-37:25 (wife used the internet to look up Wise Media and found out "[t]hat there was a class action against Wise Media"); 39:15-21 (fact that there was a class action was easy to find on the internet, easy to find out that Kronenberger was representing class); Ex. 1, Ex. C, Kimberly Brewster Dep. at 16:4-24, 17:12-15 (she googled Wise Media and found out about the class action because Kronenberger's website came up); Ex. 1, Ex. D, Fields Dep. at 66:12-22 (Googled Love Genie Tips, saw there was a lawsuit pending, emailed Kronenberger); Ex. 1, Ex. F, Kristianson Dep. at 25:16-26:20 (Googled Wise Media or HoroscopeGenie and contacted Kronenberger); Ex. 1, Ex. G, Kunder Dep. at 94:4-14 (Googled "Wise Media scam" and found Kronenberger); Ex. 1, Ex. I, O'Hanks Dep. at 54:2-13 (Kristianson went on the internet and researched, that's how he found Kronenberger); Ex. 1, Ex. J, Parmentier Dep. at 24:23-25:5 (Googled T-Mobile and found other people had complained about charges, saw a website that said Kronenberger's firm was taking some action); Ex. 1, Ex. A, Anderson Dep. at 16:1-16 (Googled Wise Media, found Kronenberger because she saw an

---

[3] The ninth witness did not do any Internet research because he relied on his wife to do so. (Ex. 1, Ex. E, D. Hanson Dep. at 73:3-11).

article in the New York Times or some newspaper). Thus, counsel's representation at the hearing that nobody would search the Internet to seek relief is belied by their clients' sworn deposition testimony. (Ex. 1, Ex. L, 10/29/13 Hrg. Trans. at 29:22-30:3).

Third, class members will see notice about the settlement whether they search for it or not because the settlement contemplates publishing notice about the settlement on the top 2,000 most trafficked websites, including Google, CNN, Yahoo, and AOL. (ECF No. 30-3 at 39-49). The notice plan also contemplates a press release that "will be distributed by PR Newswire to 5,815 newspapers, television stations, radio stations and magazines. In addition, PR Newswire will send the press release to approximately 5,400 websites and online databases, including all major search engines." (ECF No. 30-3 at ¶ 24).

Fourth, the mobile carriers and the content providers contractually prohibit m-Qube from using phone numbers received by Mobile Messenger or m-Qube for any purpose other than to fulfill their contractual requirements. (Ex. 6, D. Wedd Dec. at ¶ 21). More importantly, m-Qube has no permission from the consumers themselves to send them any type of text message or use their personally identifiable information such as phone numbers for any purpose whatsoever. Thus, m-Qube could not perform reverse look-ups without exposing them to breach of contract damages and penalties, and tort invasion of privacy. The cost of those damages and penalties would further reduce the money available for claims in all events.

Fifth, intervenors found out about the lawsuit before the preliminary approval hearing, thereby proving that notice of the settlement already exists beyond the confines of this lawsuit.

Finally, proposed intervenors failed to provide any expert or other declaration explaining how or why the proposed notice plan is insufficient or does not comport with due process. This

14

is because the notice plan does, in fact, comport with due process and intervenors cannot show otherwise.

### E.  Claim Form

The claim form is not onerous.  Claimants need only submit the claim form, and no other documentation is needed.  Further, class members are only required to complete the portion of the claim form for which they seek relief.  Class members who seek only subscription charge claims are not, as intervenors contend, required to complete the text message claim portion of the claim form.  Likewise, class members who seek only text message claims do not need to complete the subscription charge section.

m-Qube agreed to a claim form that requires certain information for two reasons.  First, given the substantial remedy for text messages ($100 per message without limit), requiring some validation information is needed to prevent fraud.  Second, some limited transaction information is needed from the class members because m-Qube may not otherwise know whether the claimant has received a full or partial refund from the Third Party Content Provider.  (Ex. 6, D. Wedd Dec. at ¶ 22).

### F.  Claim Payment and Administration

Proposed intervenors wrongly construe the claims payment and administration process. Section 7.5 of the settlement requires the settlement administrator to pay claims to claimants: "the Claims Administrator shall pay all Approved Claims by check and mail them to the Claimant via first-class mail."  Thus, the statement by intervenors that "the Mobile Messenger Companies are 'solely responsible' for issuing payments to claimants, which is a classic example of the fox guarding the hen house," is false.  (ECF No. 39 at 7).

15

Intervenors also wrongly conclude that a claim form may be rejected if a class member already received a partial refund. (ECF No. 39 at 7). Nothing in the settlement precludes a class member from claiming amounts for which they never received a refund. Indeed, the claim form specifically allows class members to specifically identify the transactions and specific amount for which they seek a refund. (ECF No. 30-1 at 43-44).

### G. Release

The parties never intended to seek a release of future claims. The settlement releases claims that class members can bring in the future (*i.e.,* claims that are not time-barred) regarding specific events that occurred in the past, and the parties agreed to add clarifying language in this respect. Further, as noted above, the parties agree to identify all released parties by name, shortcode, or program name to best enable the Court and class members to identify who and what is being released, and the reference to a list of "John Doe" released parties will be removed from the proposed agreement. To be sure, as a material condition of the agreement, m-Qube has required a release for the public mobile network operators and the other parties involved in the alleged wrongdoing to prevent class members from accepting full settlement benefits and then suing other parties involved in the transaction only to have those other parties seek indemnification from m-Qube.

Finally, the settlement seeks a release only for claims related to the following: (1) unauthorized charges on mobile phone bills, (2) messages sent to mobile devices via certain specified shortcodes, and (3) claims related to whether any Settlement Class members consented to receive text messages sent to their mobile devices associated with any Released Party. (ECF No. 30-1 at 2.40). The settlement does not seek a general release of all past and future claims as intervenors suggest. m-Qube would be prepared to add clarifying language in this respect.

16

### H. "Conflict of Interest"

There is no conflict of interest, and intervenors failed to cite any legal authority for their objection. In all events, $100 per text message for TCPA damages is generous compared to the $20-$40 that *Geier's* counsel obtained in another case as noted above, and Mobile Messenger and m-Qube do not have hundreds of millions of dollars to pay class members for TCPA damages. The settlement is a fair, reasonable, and adequate compromise of claims, and the "conflict of interest" objection is designed only to delay the substantial benefits that Mobile Messenger and m-Qube agreed to confer on class members nationwide.

### IV. CONCLUSION

For these reasons, m-Qube respectfully requests the Court deny the motions to intervene.

Dated: November 5, 2013

Respectfully submitted,

 s/ Ari N. Rothman
Ari N. Rothman
Molly T. Cusson (*pro hac vice*)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004-1601
anrothman@venable.com
mtcusson@venable.com
(202) 344-4000 (phone)
(202) 344-8300 (fax)

John P. Passarelli
Paul R. Gwilt
KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
paul.gwilt@kutakrock.com

*Counsel for Defendants Mobile Messenger Americas, Inc. and M-Qube, Inc.*

17

**CERTIFICATE OF SERVICE**

    I hereby certify that on November 5, 2013, I filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| Ben Barnow | Carrie S. Dolton |
| Blake A. Strautins | Michael T. Hilgers |
| Erich P. Schork | GTOBER, HILGERS LAW FIRM |
| Sharon A. Harris | cdolton@goberhilgers.com |
| BARNOW & ASSOCIATES LAW FIRM | mhilgers@goberhilgers.com |
| b.barnow@barnowlaw.com | |
| b.strautins@barnowlaw.com | Renae D. Steiner |
| e.schork@barnowlaw.com | HEINS, MILLS LAW FIRM |
| s.harris@barnowlaw.com | rsteiner@heinsmills.com |
| | |
| Mitchell L. Burgess | |
| BURGESS, LAMB LAW FIRM | |
| mitch@burgessandlamb.com | |
| | Jeffrey M. Rosenfeld |
| Ralph K. Phalen | Karl S. Kronenberger |
| PHALEN LAW OFFICE | KRONENBERGER, BURGOYNE LAW FIRM |
| phalenlaw@yahoo.com | jeff@kronenbergerlaw.com |
| | karl@kronenbergerlaw.com |
| Richard J. Schicker | |
| SCHICKER LAW FIRM | William L. Reinbrecht |
| rschicker@teamschick.com | CAR, REINBRECHT LAW FIRM |
| | billr205@gmail.com |

    The undersigned further certifies that a true and correct copy of the foregoing was served by first-class, United States mail, postage prepaid, this 5th day of November, 2013, upon:

Toby J. Marshall
TERRELL, MARSHALL LAW FIRM
936 North 34th Street
Suite 300
Seattle, WA 98103-8869

Elizabeth Ryan
John Roddy
BAILEY, GLASSER LAW FIRM
125 Summer Street
Suite 1030
Boston, MA 02110

                                                        /s/ *Paul R. Gwilt*

                                                        *Counsel for Defendant Mobile Messenger Americas, Inc. and m-Qube, Inc.*