**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| Cullan and Cullan LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>m-Qube, Inc., *et al.*,<br><br>Defendants. | Case No. 8:13-cv-00172<br><br>The Honorable Joseph F. Bataillon |

**PLAINTIFF'S BRIEF STATING ITS REASONS FOR OPPOSING THE MOTIONS TO INTERVENE FOR PURPOSES OF OBJECTING TO THE PROPOSED SETTLEMENT**

NOW COMES plaintiff Cullan and Cullan LLC ("Plaintiff"), individually and on behalf of the Settlement Class (as defined in the Stipulation of Settlement[1]), by and through counsel, and as its brief stating its reasons for opposing the Expedited Motion of Richard Geier ("Geier") of Washington (1) to Intervene for Purpose of Objecting to Proposed Settlement and (2) to Postpone Preliminary Approval Hearing [D.E. ##38 39], and David Hanson and Kristian Kunder's ("Hanson Objectors") Motion to Intervene for Purpose of Objecting to Proposed Settlement [D.E. #42] (collectively referred to as the "Motions to Intervene" and "Movants"), states as follows:

## INTRODUCTION

The settlement in this matter was reached after months of arm's-length negotiations between experienced class action counsel. The settlement provides that Mobile Messenger and m-Qube will make significant service improvements and assurances relating to the complained-

[1] The definitions contained in the Stipulation of Settlement are incorporated herein by reference.

of conduct and that Defendants will create a six million dollar ($6,000,000.00) Settlement Fund, which may be increased by an additional $500,000.00,[2] from which all Notice Expenses, Approved Subscription Charge Claims and Message Claims, Claims Administration Expenses, an incentive award to Class Representative, and the Fee Award will be paid. The settlement provides Settlement Class members refunds for unauthorized subscription charges ("Subscription Charge Claims") and shall pay $100.00 to Settlement Class members for each unsolicited text message from any Premium Short Code administered through Mobile Messenger or m-Qube ("Message Claims"). *See* Stipulation of Settlement ("SA") ¶¶5.2.1–5.2.4.[3]

Despite these excellent benefits, Movants seek to intervene to object to the settlement and Hanson Objectors seek to intervene to move to dismiss or transfer Plaintiff's claims. But Movants fail to satisfy the requirements for intervention. Moreover, Movants need not intervene to protect their interests in objecting to the settlement, because their objections to the settlement—conclusions largely based on incorrect readings of the settlement terms and complaints that appear more attorney-driven—can be heard in due course at the final fairness hearing as part of the objection process provided for under the settlement. This process and procedure is customary in the class action settlement context.

Additionally, allowing Movants to intervene at this stage would unduly obstruct, delay, and prejudice the adjudication of Plaintiff's and Settlement Class members' rights. And, adding to its impropriety, Hanson Objectors' request to intervene at this stage to move to dismiss or transfer this matter is late by their own making. Their "just-before-the-hearing" filing technique

[2] If, after paying Notice Expenses, Approved Claims, Claims Administration Expenses, the incentive award to Class Representative, and the Fee Award, the Settlement Fund is depleted, then Defendants shall contribute an additional $500,000.00 into the Settlement Fund. SA ¶5.2.4.

[3] Citations to paragraphs of the Stipulation of Settlement are denoted by "SA."

warrants no reward, and certainly not a departure from established and adequate objection procedures.

Movants spend most of their papers accusatorily attacking the settlement and Proposed Settlement Class Counsel. In attempting to persuade the Court of their position, they suggest they will recover hundreds of millions of dollars if allowed to carve their cases out of the settlement and litigate them to conclusion. Experience teaches that those expectations are not even close to realistic. Similarly, Movants' accusations of collusion are not only false and improper, but also unprofessional and contrary to accepted principles of professional decency. Movants' reckless assertions do not alter that their requests are deficient and incorrect.

Respectfully, Movants' Motions to Intervene should be denied.

**ARGUMENT**

Attempts to intervene at the preliminary approval stage, particularly for the purpose of objecting, seek a departure from established class action procedure and, when made, are routinely rejected by federal courts. *See, e.g., Calibuso v. Bank of Am. Corp.*, No. 10-CV-1413 PKC, 2013 WL 5532631 (E.D.N.Y. Oct. 4, 2013) ("The [motion to intervene], and any others like it, will not be allowed to derail the settlement process: the train has already left the station, and the next stop is the preliminary approval hearing."). These decisions are generally based on conclusions that: (1) allowing objectors to intervene at the preliminary approval stage would represent a marked departure from class action settlement review and approval, a process which is well-defined by Federal Rules and established practice and procedure; (2) allowing objectors to intervene at the preliminary approval stage would unduly obstruct and delay the settlement approval process; (3) intervention is not necessary to protect a settlement class member's

interests because a settlement class member may object to a settlement, opt out of a settlement, or appear at a final fairness hearing; or (4) a request to intervene was untimely.[4]

Movants provide no reasonable basis for the Court to depart from established authority, and their Motions to Intervene should be denied.

## I. Legal Standard.

A movant is entitled to intervention as a matter of right upon a showing that "(1) it has a recognized interest in the subject matter of the litigation; (2) the interest might be impaired by the disposition of the case; and (3) the interest will not be adequately protected by the existing parties." *S. Dakota ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785 (8th Cir. 2003); *see also* Fed. R. Civ. P. 24(a). Additionally, it is within a court's discretion to permit a movant to intervene upon timely motion showing that they have "a claim or defense that shares with the main action a common question of law or fact" and, when exercising such discretion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *See* Fed. R. Civ. P. 24(b)(1), (3). In all instances regarding intervention, "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).[5]

Further, "[i]f there is no right to intervene under Rule 24(a), it is wholly discretionary with the court whether to allow intervention under Rule 24(b) and even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the

---

[4] *See Gascho v. Global Fitness Holdings, LLC*, No. 2:11-CV-00436, 2013 WL 5487339 (S.D. Ohio Sept. 30, 2013) (denying request to intervene at the preliminary approval stage); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 2012-2 Trade Cases P 78108, 2012 WL 5989763 (E.D.N.Y. Oct. 24, 2012) (same); *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 606–07 (W.D.N.Y. 2011) (same).

[5] Movants have attached no such pleading to their motions.

court may refuse to allow intervention." 7C Wright, Miller & Kane, Federal Practice and Procedure § 1913, at 376–77.

**II. Movants Need Not Intervene to Object to the Settlement.**

The settlement provides a process for objecting to or opting-out of the settlement in accordance with established class action practice and procedure. Movants (assuming they are Settlement Class members) will have the right to raise any objections they may have to the settlement with the Court at the final approval stage. SA ¶ 9.2. As such, Movants' ability to protect their interests in opposing the settlement will not be impaired or impeded absent intervention. *See Calibuso v. Bank of Am. Corp.*, No. 10-CV-1413 PKC, 2013 WL 5532631, at *2 (E.D.N.Y. Oct. 4, 2013) (collecting cases); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 2012-2 Trade Cases P 78108, 2012 WL 5989763 (E.D.N.Y. Oct. 24, 2012) ("I also see no need to establish procedures for absent class members—who will have ample rights to be heard before any final approval is even considered—to intervene so they can be heard in connection with the pending application for preliminary approval.").

The objection process is embedded in class action law and provides for an organized and complete approach to obtaining class members' views of a settlement. Any view or complaint that these apparent objectors have can be fully presented in accordance with the objection process and procedures. Adherence to the objection process and procedures not only allows Movants to fully present their views, but also prevents interference with the rights of Settlement Class members, along with the Court's and all class members' consideration of the settlement and the delivery of its benefits, without the disruption and delay Movants seek to cause through their Motions.

## III. Movants Have No Interests That Will Be Impaired By the Disposition of this Case.

Movants make much of the fact that their interests will allegedly be substantially impaired if the settlement goes forward, but produce little, if any, evidence to support such claims. The reality is that the settlement provides for a full refund for unauthorized subscription charges and $100.00 to Settlement Class members for each unsolicited text message from any Premium Short Code—a substantial recovery for a case of this nature. *See, e.g.,* SA ¶5.2. In addition, the settlement also provides for substantial injunctive relief, which Hanson Objectors do not even seek in their complaint. *Compare* SA ¶5.1 *with Fields* Complaint. The settlement is in line with other settlements of this nature. *See infra*, Section VII.

Hanson Objectors fail to mention that Wise Media LLC, one of the defendants in their case, is expressly excluded from the release in the settlement:

> "Released Party" excludes any and all of the following parties, and any and all of their parent companies, subsidiaries or affiliated companies under common control, and any of their past, present or future officers or directors to the extent that they occupied those roles during the time that such party acted as a Third Party Content Provider, those parties being: . . . Wise Media LLC . . . .

SA ¶2.36(iii). Thus, Hanson Objectors' interest in pursuing their claims against Wise Media LLC—a critical party, according to their complaint—is fully preserved and, thus, not impaired by the settlement.

Further, Movants—and any other Settlement Class members—have the right to opt out of the settlement. *See* SA ¶9.1. Movants have their own pending litigation, and their right to continue as plaintiffs in those cases can proceed if they opt out. While their attorneys' entitlement might be affected if they were otherwise somehow unable to obtain their own settlement or a litigated class, that is no reason to stop this settlement.

While Movants' interests are allegedly not identical with Plaintiff's, they are common, as are their respective legal and factual positions, which will be resolved under the settlement. *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2325798, at *4 (D. Minn. June 19, 2012), *aff'd*, 716 F.3d 1057 (8th Cir. 2013) (citing *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999)). Movants take issue with the fact of a settlement itself, but primarily for the sake of carving their respective putative classes out of this settlement. That is no valid reason to allow intervention—it is, at best, a difference of opinion as to how to proceed with this litigation. *Jenkins by Jenkins v. State of Mo.*, 78 F.3d 1270, 1275 (8th Cir. 1996).

Movants attempt to use the status of their pending motion for class certification in *Fields* as a basis for intervention, but this argument has been rejected. As the court held in *George v. Upton*, "[a]ccording to the parties, discovery in *Sweidan* has proceeded in earnest and class certification has already been briefed. . . . If anything, class certification in *Sweidan* may affect how this action proceeds." *George v. Uponor, Inc.*, 290 F.R.D. 574, 578 (D. Minn. 2013). The same holds true here, as the Parties have decided to forego the risk of future litigation and its attendant costs to resolve this matter now.

Geier complains that he would be entitled to $16,000 in statutory damages under the TCPA—but Geier's complaint does not contain a TCPA count. *See generally* Geier Complaint. Thus, Plaintiff is more than adequately representing Geier's interests, as Plaintiff has brought claims Geier intentionally omitted (perhaps in an attempt to avoid Federal jurisdiction), and for which Geier is entitled to make a claim (assuming he has a valid claim) under the settlement. Geier's willingness to forego such claims for such a purpose raises serious doubts about his adequacy as a class representative. Geier is objecting to a settlement that not only provides for a

100% recovery of his cramming claim, but to a settlement that provides for a claimed harm his lawyer has not pursued on his behalf. That raises a question as to whose objection it really is, and whether Geier even knows of it. Of course, it is made without the opportunity at present to take Geier's deposition to determine the truth of the matter. No doubt that is another reason the required and statutorily provided objection process is in place: to prevent circumventing a process that protects against separate litigation interests interfering with the interests of a settlement class.

Further, as this Circuit has held: "If [the proposed intervenor] believes the class representatives inadequate or the settlement insufficient, he should simply have opted out of the class." *In re Uponor, Inc.*, 2012 WL 2325798, at *4. Movants have had and will continue to have that option under the settlement, and they can pursue that option should they choose to do so. Intervention based on Movants' criticisms is therefore inappropriate, and their Motions to Intervene should be denied.

**IV. Movants' Intervention Would Unduly Delay and Prejudice the Adjudication of the Rights of Plaintiff, the Settlement Class, and Defendants.**

"Considerations of judicial economy counsel strongly in favor of not converting the preliminary approval process into something akin to the plenary process that attends an application for final approval." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 2012-2 Trade Cases P 78108, 2012 WL 5989763 (E.D.N.Y. Oct. 24, 2012).

Allowing Movants to intervene in this litigation would cause undue delay to the settlement and would result in substantial prejudice to the rights of the Parties. The settlement was reached after hard-fought negotiations, including mediation overseen by a retired federal

judge,[6] and an excellent result has been achieved for the Settlement Class. Movants seek to delay and, if possible, extinguish the recovery for these individuals in trade for continued litigation and all of its risks. The refunds and injunctive relief available under the settlement would serve to immediately benefit the Settlement Class, and any delay in their implementation would be a disservice to the just and speedy resolution of this litigation. To avoid this unnecessary delay and prejudice, the Motions to Intervene should be denied.

## V. Hanson Objectors' Request to Intervene to Move to Dismiss or Transfer is Untimely and Contrary to Law.

Hanson Objectors' request to intervene to seek dismissal or transfer this case is untimely. "The issue of the timeliness of a motion to intervene is a threshold issue." *United States v. Ritchie Special Credit Inv., Ltd.*, 620 F.3d 824, 832 (8th Cir. 2010). The following "factors are relevant to the timeliness determination of a motion to intervene (1) the progress of the litigation; (2) the prospective intervenor's prior knowledge of the action; (3) the reason for delay in seeking intervention; and (4) the likelihood of prejudice to all parties." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2325798 (D. Minn. June 19, 2012) (citing *Ritchie Special Credit Inv., Ltd.*, 620 F.3d at 832). Hanson Objectors' request was filed almost 5 months after Plaintiff's complaint was filed[7], after months of arm's length negotiations, after the Parties engaged in mediation, after Parties entered into the settlement, and after the Parties moved the Court for preliminary approval of the Stipulation of Settlement. It is too late to move to dismiss or transfer this case at this stage of the proceedings, and Movants cite no authority in support of their position under any alleged "First to File Rule."

---

[6] On August 2, 2013, the parties had an all-day mediation session with the Honorable Judge Wayne R. Andersen (Ret.) through JAMS. Thereafter, the parties negotiated the Stipulation of Settlement, which was signed by all parties on October 10, 2013.

[7] Plaintiff's Class Action Complaint was filed on June 6, 2013. Hanson Objectors filed their motion to intervene on October 28, 2013.

**VI. Neither Motion to Intervene Is Accompanied By a Pleading That Sets Out the Claim or Defense for Which Intervention Is Sought, Further Warranting Denial of the Motions.**

Under Rule 24(c), Movants were required to file "a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Movants failed to meet this requirement for intervention, as no such pleadings for purposes of intervention have been submitted, and merely attaching copies of their pending complaints from different courts is insufficient to satisfy this element. This alone is enough to deny the Motions to Intervene, regardless of Movants' numerous other deficiencies outlined above. It also indicates either a clear avoidance of a requirement that, if complied with, would further show the inappropriateness of intervention, as it would show the distinct differences between the cases.

**VII. While Movants' Objections Are More Appropriately Addressed after the Preliminary Approval Stage, They Are Without Merit.**

While the Court does not have to address Movants' objections in order to determine whether Movants have met the requirements for intervention, to the extent the Court wishes to address them now, Movants' objections to the settlement are either based on incorrect readings of the settlement terms, invalid bases for objecting, or just plain wrong. That the settlement provides significant relief that Movants' counsel have not sought in their cases, bears heavily against what Movants and their attorneys seek to do. Indeed, the irony of Movants' counsel stating that as long as their cases would be carved out, they would not object, speaks loudly of their true intentions. How is it that the settlement is good for all others, as long as they get to proceed with their respective cases? Movants also assert the outrageous claim against highly experienced class action counsel—counsel who have brought Defendants to the settlement table and achieved this result, as well as many other judicially praised results over decades—that their counsel and their skills are required to adequately represent the class. Yet, Movants' counsel, by

their own words, would abandon the class if a part of the perceived bailiwick is carved out for them.

The settlement provides significant injunctive and monetary relief, and is in line with other settlements of this nature. In fact, other cases of this nature have settled for far less than that available here, such as in *Rose v. Bank of America*, No.11-cv-2390 (N.D. Cal.), and *Arthur v. Sallie Mae, Inc.*, No. 10-cv-198 (W.D. Wash.). Geier's counsel, Terrell Marshall Daudt & Willie PLLC, was plaintiffs' counsel in both settlements. Geier conveniently fails to mention either settlement in his papers, even though a comparison of those cases, as illustrated below, is appropriate, revealing, and supports preliminary approval of the settlement here.[8]

**A. Monetary benefits.**

In *Rose v. Bank of America*, the plaintiffs alleged violations of the TCPA related to calls and texts messages made without the class members' prior express consent. Under the *Rose* settlement, each class member can only make one claim for a mortgage-related call and one claim for a credit card-related call or text. *See Rose v. Bank of America* Settlement Agreement and Release, ¶4.03, attached hereto as Exhibit 1 (exhibits have been omitted). Thus, the relief for a class member under the Rose settlement is limited to a maximum of two claims, even if he or she received, for example, ten or more unauthorized calls or texts. Potential damages there—using Geier's barometer of $500 per unsolicited text message under the TCPA—for the 7.7 million class amount to more than $3.85 *billion*, even though the settlement fund is just $32 million. Bank of America has a market capitalization of nearly $150 billion, though, and is a

[8] Plaintiff's counsel has not located any comparable class settlements by Hanson Objectors' counsel. One plaintiff class action was located for Kronenberger Rosenfeld, LLP (other than their current *Fields* case): *Humble v. Wise Media, LLC*, No. 12-cv-1203 (N.D. Cal.). But, in that case, a dismissal with prejudice was filed early on, because the plaintiff could not refute the produced documentation that he in fact had notice and authorized the very conduct that his pleading alleged was unlawful. *See* Notice of Dismissal (Mar. 27, 2012), attached hereto as Exhibit 4.

company that could pay more than was agreed. The reduction must have surely come from a full evaluation of the value of the claims and their nature, as well as an appreciation of settlement over protracted litigation.

Under the Amended Settlement Agreement in *Arthur v. Sallie Mae*, the "parties estimate[d] that the amount of the Cash Award and Reduction Award[[9]] (while dependent upon the number of claims) may be within the range of $20.00 to $40.00" for the settled TCPA claims. *See Sallie Mae* Amended Settlement Agreement, ¶III.C.2(d), attached hereto as Exhibit 2 (exhibits have been omitted). The settlement also allows for credit against the settlement fund for Reduction Awards. *Id.* ¶III.C.3.(b). Again, counsel for the plaintiffs there (including Geier's counsel) set forth that the case was worth another astronomical sum—$12 *billion*—yet, the settlement fund amounted to just $24 million.

The attorneys in those cases obviously realized the fantasy of such calculations of potential damages in agreeing to the amounts in the respective settlement funds. Yet, Geier and his counsel continue to assert such lofty valuations of potential recoveries, maintaining that for Washington consumers *alone*, their damages amount to over $225 million, which they assert can be trebled to $675 million—again, *just* for Washington consumers. Similarly, Hanson Objectors' valuation of the claims in this case at $750 million parallels such grandiosity. Hanson Mot. at 9.

In contrast to the *Bank of America* and *Sallie Mae* settlements, the settlement here makes available to Settlement Class members *full* refunds of *all* unauthorized Subscription Charge Claims and $100 for *each* unsolicited text message from any Premium Short Code administered

[9] "'Reduction Award' means a one-time reduction from the principal balance of an eligible Settlement Class Member's outstanding extension of credit," for which Sallie Mae is entitled to receive a credit against the settlement fund. *Sallie Mae* Settlement ¶¶II.AA., III.C.3.(b). Despite including this language in their settlement there, Geier's counsel attacks the settlement here for its similar provision providing for credits of only 50% for refunds and chargebacks. *See* SA ¶5.2.1. Such a provision merely prevents double payments to those consumers who have already received refunds for purportedly unauthorized charges.

through Mobile Messenger. *See* SA ¶¶5.2.2, 5.2.3. Only if the Notice Expenses, Approved Claims, Claims Administration Expenses, the incentive award to the Class Representative, and the Fee Award exceeds $6,500,000, will the Message Claims be paid on a pro-rated basis. This case represents a circumstance where there was a multi-step procedure in place requiring a number of consumer approvals before they could be legitimately accessed. This is not a case where text messages were spread asunder without such a process in place. *See*, *e.g.*, Defendant C.F. Enterprises' Motion to Compel Arbitration, D.E. #17 (detailing the affirmative steps that consumers must take to subscribe to its Mobile Content). Movants have set forth no evidence regarding the number of Settlement Class members with valid claims for unauthorized subscription charges and related text messages.

Here, Settlement Class members who contest the charges or messages have the opportunity to do so and their recovery is protected from fraudulent claims by a fair claims process. Additionally, notice will be provided by an experienced class action notice provider that has proposed a detailed and comprehensive plan not only designed for this case, but also proven by acceptance in other courts for other significant class actions. *See generally* Affidavit of Jeffrey D. Dahl With Respect to Settlement Notice Plan [D.E. #30-3]. Given the affirmative steps that consumers were required to take to sign up for the concerned Mobile Content, Movants need more than just speculation to refute that the settlement is fair, reasonable, and adequate. The quick dismissal of the *Humble* case by one of Hanson Objectors' counsel indicates at least their counsel's knowledge of facts that their objection has failed to either recognize or admit.

In the *Bank of America* settlement, the number of class members that received the unauthorized, complained-of calls and texts was known to Bank of America (unlike the situation here). If every one of those 7.7 million class members submitted a claim (which, of course, will

not happen),[10] each would receive less than $3.00.[11] This case, on the other hand, includes the reality that the process in place before a text message is sent cuts greatly into the amount of claims. This is not a case where random text messages, each of which is known to be illegal, are sent to consumers. Here, there was a multi-step process in place that sought authorization for any of the communications at issue in this litigation. In cases such as *Sallie Mae* or *Bank of America*, where they know that each of the communications was illegal, those settlements, in effect, provide for very small potential claim amounts, even though the defendants that could withstand a much greater judgment than the settlement amount. There is no reasonable basis for the challenge to this settlement on the claim values, where provision is made for 100% of Subscription Charge Claims and $100 for each Message Claim.

**B. Injunctive relief.**

In the *Bank of America* settlement, the parties "agree[d] that the core relief under the Settlement is Bank of America's business practice changes." *Bank of America* Settlement ¶4.01. Here, the settlement provides for a significant change in Mobile Messenger Companies' business practices with regard to the complained-of conduct. SA ¶5.1. The Mobile Messenger Companies will themselves control and maintain for a minimum of three (3) years, a new process for administering premium SMS opt-ins for its Mobile Content provider clients. *Id.* Mobile Messenger Companies or Wireless Carriers, and not any Third Party Content Provider, must themselves control and be responsible for administering and confirming all Wireless Subscribers' opt-ins to Mobile Content charges administered through short codes operating

---

[10] The *Bank of America* settlement included a claims process, even though a database existed identifying those who received the complained-of calls and texts.

[11] This is calculated by taking the Settlement Fund of $32,083,905.00 and subtracting $8,020,976.25 for attorneys' fees (25% of the $32,083,905.00 fund) and approximating $3,000,000 for Notice costs and costs of Claims Administration, which equals $21,062,928.75 to be split amongst 7.7 million class members.

through the Mobile Messenger systems. *Id.* These changes are far more detail oriented and structured than the relief obtained in *Bank of America* and far more sweeping than the practices of one bank and its text messaging practices.

At the Court's recent hearing on October 29, 2013, counsel for Hanson Objectors stated that "the FTC has weighed in on this and said that cramming is a major problem in the United States and the aggregators are the key parties that can, and I guess the best parties, in a position to prevent it." Hr. Tr. at 24–25 (Oct. 29, 2013), attached hereto as Exhibit 3. The injunctive relief provided for under the settlement directly addresses this problem and the FTC's goal of preventing cramming, and should therefore satisfy Hanson Objectors' purported concerns about any continuation of such conduct by Defendants. One wonders how the point he made could have been posited as part of an objection had he read the Stipulation of Settlement.

**C. Notice.**

In yet another indication of the scant attention paid to the Stipulation of Settlement, Movants' erroneously argue that there is no "actual" or "direct" notice to Settlement Class members, even though the settlement states the exact opposite. In addition to Internet publication notice and targeted Internet Advertising, the settlement also provides for direct notice via email or via U.S. mail by postcard to Settlement Class members:

> Direct notice shall be via electronic mail to all Settlement Class members whose email information is in either Defendants' possession or Released Parties' possession, if it can be reasonably obtained. Defendants shall endeavor to see that Released Parties make all reasonable efforts to obtain as many email addresses as reasonably possible. If any email results in a bounce-back or otherwise undeliverable message, the Settlement Class Notice shall be delivered by postcard if Defendants possess a mailing address, sent at the specified rate for postcards established by the United States Postal Service, to the last known physical address of the addressee of such email.

SA ¶8. The proposed Notice Plan here meets constitutional standards and is projected to reach 95% of all Settlement Class members. Affidavit of Jeffrey D. Dahl With Respect to Settlement Notice Plan, ¶18 [D.E. #30-3].

**D. There is no evidence of collusion.**

Movants argue that the attorneys' fees are "excessive and collusive." Geier Memo. at 7. Geier—brushing aside the fact that any request for attorneys' fees in this matter is subject to Court approval (SA ¶2.16)—calculates a weekly attorneys' fee based on the weeks between the filing of the complaint and the mediation, which ignores, *inter alia*, the work leading up to the filing of the complaint, the drafting and negotiating of the actual Stipulation of Settlement, and the work preparing the preliminary approval papers and preparing for the hearing. The attempt is sophistry. Plaintiff's counsel's time in this case already exceeds $300,000, and their costs and expenses exceed $7,000. And, of course, there is more work to be done, including resolving the Motions to Intervene, dealing with objections, moving for final approval, and marshalling this case to its conclusion, including Class Counsel work that routinely follows a claim process.

Putting aside the fact that the fees here are more than reasonable based on the results achieved and the lodestar of counsel (an increasing number), the analysis for which Geier advocates as evidence of collusion ("fees divided by months") falls even further asunder when measured by their *Sallie Mae* case. In the *Sallie Mae* settlement, plaintiffs' counsel—including Geier's counsel, Terrell Marshall Daudt & Willie PLLC—sought and obtained far higher fees than sought here. Using the first filing date of February 2010, to the time of filing the Amended Settlement Agreement on October 11, 2011 (which is 20 months), the requested fees of $4,830,000 (which is 20% of the value of the Fund) amounts to $241,500 per month, or $60,375 per week. *See Sallie Mae* Amended Settlement Agreement at Section III.E. In the *Bank of*

*America* settlement—another case in which Geier's counsel, Terrell Marshall Daudt & Willie PLLC, is in—plaintiffs' counsel negotiated attorneys' fees of $8,020,976.25 (25% of the $32,083,905.00 fund), which amounts to $320,839.05 per month—or $80,209.76 per week—between the time of the filing of the first complaint and the settlement.[12] Although the Geier calculation is pointless, if not comedic, that amount is comparable to the $80,000 per week that Geier's odd fee-determining math alleges is evidence that the settlement is collusive. Movants' claims of collusion based upon the negotiated attorneys' fees are not credible. The fact that Plaintiff's counsel achieved significant relief for the Settlement Class should be rewarded. The fact that the settlement was achieved at an early stage in the litigation is not evidence of collusion. *See Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 633 (6th Cir. 2007) ("The timing of a settlement by itself does not establish collusion."); *In re Crocs, Inc. Sec. Litig.*, No. 07-CV-02351-PAB-KLM, 2013 WL 4547404 (D. Colo. Aug. 28, 2013) (same).

**E. The claim process.**

Movants also complain that the claim process under the settlement is "onerous," and will result in no claims. But, the process for filing a claim is quite simple, as a review of the settlement and proposed claim forms reveal. Claims can be filed either electronically online or through the mail. SA ¶6.2. Claimants need submit the following information: their name, address, telephone number, and email address used in any communications with Defendants; the wireless number associated with any mobile device that received a message or incurred a charge for which they are making a claim; and, depending on the type of claim they are filing, additional information to demonstrate that they have incurred unauthorized charges. SA ¶6.3. The process

[12] The first complaint, *Ramirez*, was filed on August 31, 2011, and the settlement was filed on September 27, 2013, which is 2 years and 1 month (25 months). $8,020,976.25 (25% of the $32,083,905.00 fund), divided by 25 months equals $320,839.05 per month.

is simple and direct, not confusing or onerous. Such information is necessary to protect the claim process and ensure valid claims. Fraudulent claims diminish a settlement fund. Providing a claim process that calls for reasonable information to support claims provides for a fair claim process, and including an appeal process, as this settlement does, is not against Settlement Class members' interests. Rather, it serves to protect the settlement and is in Settlement Class members' interests.

Interestingly, the claim process here is very similar to the one required in the *Bank of America* settlement—a settlement where, unlike here, the Defendant knew the names of every individual who had received a call or text in violation of the TCPA. Yet, despite *Bank of America* having all necessary information, counsel for the parties there required a claim process in that settlement, including counsel for Geier.

**F. Release.**

Movants misconstrue the terms of the release. It was never the intent of the Parties to release claims arising from future conduct and the current release language does not release such claims. Nonetheless, to leave no doubt, the Parties have agreed to add the following release language or similar language to the release in the Stipulation of Settlement: "Nothing contained herein shall be construed to release any claims based on future conduct, i.e., conduct occurring subsequent to the execution date of the Stipulation of Settlement."

Further, as stated in Court and later confirmed between the Parties, the John Doe designations will be removed. The Parties will propose alternative language to the Court.

## CONCLUSION

For the foregoing reasons, the Motions to Intervene and all of the other relief requested by Movants should be denied.

Dated: November 5, 2013

Respectfully submitted,

/s/ Ben Barnow
One of the attorneys for Plaintiff

Ben Barnow (*pro hac vice*)
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
312-621-2000
312-641-5504 fax
b.barnow@barnowlaw.com

Ralph Phalen (*pro hac vice*)
Ralph K. Phalen, Attorney at Law
1000 Broadway Ste. 400
Kansas City Mo. 64105
816-589-0753
816-471-1701 fax
phalenlaw@yahoo.com

***Proposed Class Counsel***

Richard J. Schicker
Bar No. 13686
Law Offices of Richard J. Schicker
2809 So. 160th Street, Suite 101
Omaha, NE 68130

Mitchell L. Burgess (admitted *pro hac vice*)
BURGESS & LAMB, P.C.
1000 Broadway, Suite 400
Kansas City, MO 64105
Telephone: (816) 471-1700
Facsimile: (816) 471-1701
Email: mitch@burgessandlamb.com

***Additional Plaintiff's Counsel***

**Certificate of Service**

The undersigned hereby certifies a true and correct copy of the foregoing was served via filing with the Court's e-filing service, on this 5th day of November, 2013.

/s/ Ben Barnow