IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CULLAN AND CULLAN LLC,
On behalf of Itself and
All Others Similarly Situated,

        Plaintif,

        v.

M-QUBE, INC., *et al.*,

        Defendants.

Case No. 8:13-cv-00172

The Honorable Joseph F. Bataillon

## MOTION TO RESCHEDULE THE MARCH 9, 2017, FAIRNESS HEARING

Moving defendants PostSMS Qube Co, Inc. (formerly M-Qube, Inc.) and PostSMS Americas Co, Inc. (formerly Mobile Messenger Americas, Inc.) request that the Court reschedule the March 9, 2017, final fairness hearing until June 9, 2017, or such other date as the Court's schedule permits. Good cause exists to grant the requested extension to allow defendants sufficient time to obtain the data they need to compare their actual transaction data against the information submitted in claims submitted by purported class members, and to present the results of that comparison to class counsel, the parties themselves, and the Court. The United States Department of Justice has the systems containing the needed data for its prosecution of an unrelated criminal case. And, until those systems can be accessed, or records can be checked by a third party that defendants believe has the data, nobody will know the extent to which any valid claims were received, and nobody can judge the fairness of the proposed settlement. Indeed, current indications are that many of the claims, if not most of them, are facially invalid.

Continuing the fairness hearing for a short period will allow sufficient time to review the claims and present relevant findings to class counsel and the Court so that all involved are fully

informed about whether the settlement is fair, adequate and reasonable under Rule 23(e). The brief extension also will ensure that all involved understand the extent to which moving defendants will challenge invalid claims, as they are permitted to do, under section 6.4 of the settlement agreement. Class counsel does not consent to the requested extension.

## The Settlement Agreement

Moving defendants agreed to pay $30 for each "valid Subscription Charge" incurred by each class member submitting a valid claim. (ECF No. 168-1 at § 5.) Defendants did so to settle allegations that defendants charged consumers for mobile content, also known as "premium SMS services," without authorization during the time period designated in the agreement. (ECF No. 168-1 at § 2.39.) Defendants' agreement represented a significant concession because class members were predominantly charged only $9.99 per subscription charge during the entire class period, with only a very small portion at the beginning of the period enrolling in $19.99 programs. (Ex. 1, D. Machock Decl. at ¶ 2.)

The systems defendants used to record and monitor applicable transactions are the same systems they need to validate claims. Those systems, in turn, collected each class member's phone number used in each transaction, and transaction details such as "short codes" (short phone numbers used to interact with "content providers" like co-defendant CF Enterprises), dates, times, and messages sent to and received from each customer via the short codes, and the amounts charged to consumer phone bills via those "premium" short code interactions. These systems did not collect class member names or physical addresses. Thus, in the needed comparison, the phone numbers submitted by purported class members on their claim forms will be checked against the actual messaging and transaction records to determine which of them transacted through defendants' systems. Such a comparison would also check whether users of those phone numbers

"opted in" for premium SMS programs by receiving and submitting a unique PIN number sent to their mobile phone via the short codes, or whether they incurred a "Subscription Charge" at all, for which the settlement agreement provides relief.

### The Claims Process

The settlement agreement provides an easy process for settlement class members to submit claims. (ECF No. 168-1 at 36.) The agreement also requires that each class member submit his or her name, mailing address, and the phone number to which a "Subscription Charge" was made. (ECF No. 168-1 at § 6.3.)

### The Settlement's Claims Challenge Process

The settlement agreement requires moving defendants to pay $30 for each valid "Subscription Charge Claim." (ECF No. 168-1 at §§ 5.1-5.2.) The agreement further provides:

> Valid Subscription Charge Claims are for charges as to which the Claimant believes double opt-in consent was not provided by them or lawfully for them, unless Mobile Messenger proves with clear and convincing evidence that the alleged absent double opt-in consent was given by the Claimant or authorized and lawfully given on the Claimant's behalf. Double opt-in consent consists of a person authorized on Claimant's Wireless Carrier account ordering the enrollment for the subscription charge, followed by immediate direct confirmation that the wireless handset operating on that phone number was in fact in that person's physical possession at the time of the enrollment.

(Id. § 5.2.) The agreement allows defendants to challenge the claims by submitting a written challenge to the claims administrator, and appealing any adverse rulings to a special master. (Id. at § 6.4.)

Determining whether a claim is "valid" requires two steps. First, the mobile phone number must be checked against the "message logs" which contain transactional information corresponding to the mobile phone number. If the phone number is not present, that indicates that

3

the claim is not valid because the phone number never transacted with either of the moving defendants.

Second, if the class member's phone number is present in the messages logs, other records will be checked for each such phone number to determine whether the phone number was charged, whether the class member was refunded, and whether there is "clear and convincing" evidence that the class member in fact opted in to the charges per section 5.2 of the settlement agreement. (Id. at § 5.2.) However, nobody can undertake these steps without the data now in the possession of the Justice Department or a third party (mGage) as discussed more fully below.

### Claims Received to Date

The claims received to date suggest that many, if not most or all of them, are facially invalid. The claims administrator has reported that as of January 17, 15,995 claims have been submitted. (Ex. 1, D. Machock Decl. at ¶ 4.) Of those, 11,765 class members stated that they did not know whether they incurred a Subscription Charge Claim at all. (Id.) Moreover, of the purported class members, only 609 identified dates of charges that corresponded to the dates within the Class Period (commencing January 1, 2010, and lasting through the date when defendants and the mobile phone operators discontinued premium SMS services on November 23, 2013.) (ECF No. 168-1 at 36, (Defining "Class Period" as, "From January 1, 2010 to the Notice Date.")) And of those 609 claimants, a mere 37 identified charges that corresponded to charge amounts that could have been charged to consumers for premium SMS services, namely, 28 at $9.99 and 9 at $19.99. (Id. at ¶¶ 4 through 6.)

Of those mere 9 facially valid claims, one of them was for a charitable donation to the American Red Cross. (Id. at ¶¶ 7.) Moreover, the claims administrator itself reported a great number of claims (On January 17, 2017 the number was 1,277) were being submitted from the

4

same IP addresses (digital address of each computer modem on the Internet), or were duplicate claims, suggesting use of an automated process to submit claims. (Id. at ¶ 8.)

To be sure, co-defendant CF Enterprises, who entered a separate nationwide class action settlement in this action at the same time as moving defendants, reported very few valid claims. Indeed, of the thousands of phone numbers that potential class members provided in claims, none or almost none turned out to be phone numbers that transacted with CF Enterprises according to representations made by counsel for CF Enterprises. This, combined with the anomalies revealed by the claims tendered to moving defendants, mandates at least a basic comparison of the claims to the actual transaction and messaging data.

### The Justice Department and mGage Have Data Needed to Validate Claims

Defendants possessed the data they needed to investigate claims for validity when they entered into the settlement agreement in December of 2015. The specific data resided on servers that are physical computers assembled, configured and interconnected in a server rack, with some of the servers containing a log of all messages sent and received via the "short codes" at issue in this case, servers containing records of the content subscriptions and charges enrolled by each consumer, servers containing computer programs that enable the indexing and analysis of those records, along with storage servers and other computers for providing network connectivity and the like. The server system is proprietary and is not designed to be replicated. Without access to that server rack or something substantially similar, there is no way to investigate whether any valid Subscription Charge claims have been made. (Id. at ¶ 9.)

After the parties to this case entered into the settlement agreement in December of 2015, the United States District Attorney's office for the Southern District of New York, or "Justice Department," issued grand jury subpoenas and also requested the servers needed to investigate

claims because that office stated it needed the data for its use litigation scheduled for trial on April 3, 2017, captioned as *United States vs. Darcy Wedd, et al, 1:15-cr-00616-KBF-1*, pending in the United States District Court for the Southern District of New York. The voluminous nature of the data and its complex structure did not permit copying the data in a timely or cost effective manner. Thus, defendants transferred the servers containing the data to the Justice Department given its upcoming trial and pre-trial deadlines, and the Justice Department agreed to provide whatever data it could retrieve to defendants. The Justice Department has not yet provided any data to defendants, and defendants do not know when the Justice Department will produce any data or return the servers. (Id. at ¶¶ 10.)

Defendants also issued a third party subpoena to mGage, Inc., an unrelated third party that defendants believe has a redundant copy of at least the message log data, as a result of an acquisition of defendants' standard messaging business. (Id. at ¶ 11.) mGage has not yet agreed to fully respond to the subpoena or even state whether it has the data needed to do so.

**Good Cause Exists to Reschedule the Fairness Hearing**

Good cause exists to reschedule the fairness hearing. Foremost, almost all of the claims appear to be invalid and defendants intend to challenge the invalid claims as they are permitted to do under section 6.4 of the settlement agreement. Indeed, initial indications are that a great many of them are invalid. However, the fairness hearing is less than one month away and despite their best efforts, defendants have been unable to obtain access to the transaction records needed to validate the claims. There is no chance anyone can investigate the claims and provide their investigation results to class counsel or the Court before the March 9th fairness hearing.

Defendants acknowledge that the claims dispute procedure in the agreement provides them adequate protections against paying invalid claims. Defendants likewise acknowledge that all

class action settlements have at least some invalid claims and that such invalid claims do not and should not interfere with final approval.  Here, however, defendants believe they are in the unusual position of having almost no claims with enough information to validate on their face, so comparison to actual transaction records is required.  They also believe they should disclose to class counsel and the Court that they intend to challenge all invalid claims, and that invalidity of the claims could affect whether the Court should grant final approval inasmuch as the claims rate will inform whether the settlement is fair, adequate and reasonable under Rule 23(e).  Accordingly, to ensure that class counsel and the Court are fully informed about the true status of the claims, defendants submit that the Court should continue the fairness hearing so that an appropriate comparison to actual transaction data may be undertaken and the results presented to all involved.

### Class Counsel Declined to Consent to the Requested Extension

Defendants asked class counsel to consent to the relief requested herein.  Class counsel refused, and stated that any claims could be challenged after final approval. (Exs. 2-3, Email Exchanges.)

### CONCLUSION

For the foregoing reasons, PostSMS Qube Co, Inc. and PostSMS Americas Co. Inc. respectfully request that the Court reschedule the March 9, 2017, final fairness hearing until June 9, 2017, or such other date as the Court's schedule permits.

Dated:  February 23, 2017                                        Respectfully submitted,

/s/ Alan Sege
Alan Sege Esq., PC
13323 West Washington Blvd.
Suite 100
Los Angeles, CA 90066

*Counsel for Defendants Post SMS Qube Co., Inc. and PostSMS Americas Co., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February 2017, I caused the foregoing *Motion to Reschedule the March 9, 2017, Fairness Hearing* via the Court's ECF system, which will serve a copy on counsel of record who appeared for each party such counsel represents.

/s/ Alan Sege
Alan Sege

*Counsel for Defendants Post SMS Qube Co., Inc. and PostSMS Americas Co., Inc.*